# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SACHA B. DAUGHERTY,                                Case No: 1:19-cv-600

        Plaintiff,                          Black, J.

    v.                                            Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff filed this Social Security appeal to challenge the Defendant's non-disability finding. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents four claims of error for the Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

## I.  Summary of Administrative Record

The current judicial appeal is Plaintiff's second to this Court. The first resulted in remand for further review under Sentence Four of the Social Security Act. (Tr. 1061-1085; *see also* Case No. 1:16-cv-898 (Doc. 15)). Following remand to a new Administrative Law Judge ("ALJ"), the second ALJ also determined that Plaintiff was not disabled.

Both the instant appeal and the prior judicial appeal stem from Plaintiff's August 2012 applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") in which she alleged she became disabled beginning February 1, 2010, based on rheumatoid arthritis, depression and anxiety. Plaintiff was 34 years old on her

alleged disability onset date and remained a younger individual at the time of the last ALJ's decision. She completed high school and 1 year of college, as well as specialized training in marketing. (Tr. 278). She worked as a cashier, head waitress, and server at a restaurant until she was fired from that position in 2008, long before the alleged onset of disability. She lives with her minor daughter.

After Plaintiff's claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an administrative law judge ("ALJ"). On April 24, 2015, she appeared and gave testimony before ALJ Elizabeth Motta, who issued an adverse written decision on July 30, 2015. Plaintiff timely appealed from that adverse decision to this Court,

The undersigned filed a Report and Recommendation ("R&R"), subsequently adopted by the Court in September 2017, that reversed and remanded for further consideration under Sentence Four based upon the combined impact of several errors. The R&R pointed out that the errors might not have resulted in reversal had they been considered individually, but that they were sufficient in combination to require further review. The undersigned emphasized that the issues presented were "relatively close" compared with other cases requiring remand.

> An argument could be made that substantial evidence in the record as a whole supports the ultimate decision that the Plaintiff was not under a disability during the period at issue, although an argument also could be made that substantial evidence supports a contrary conclusion. Ordinarily, courts will affirm in such cases. *See Felisky v. Bowen*, 35 F.3d at 1035. However, in this case, several errors made by the ALJ were so critical and pervasive that remand for additional review is required.

(Tr. 1065).

After remand, the case was reassigned to another ALJ, Stuart Adkins. ALJ Adkins held a new evidentiary hearing on September 6, 2018 at which Plaintiff appeared with her

2

attorney and provided new testimony, as did a new vocational expert. On October 26, 2018, ALJ Adkins issued another adverse written decision. (Tr. 935-957). In the 2018 decision, the ALJ noted that Plaintiff was insured, for purposes of DIB, only through December 31, 2013. He concluded, as had the prior ALJ, that the record did not document any medically determinable impairment until more than a year after her alleged onset date. At that point she developed the following severe impairments: Rheumatoid arthritis, fibromyalgia, panic disorder, anxiety, agoraphobia, and depression. (Tr. 937).

The ALJ found that none of Plaintiff's impairments met or medically equaled a Listed Impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that she was entitled to a presumption of disability. (Tr. 939). Instead, the ALJ determined that Plaintiff possesses the residual functional capacity ("RFC") to perform work at the light exertional level, subject to the following additional limitations:

> (1) lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently; (2) standing and/or walking for about four hours and sitting for about six hours in an 8-hour workday; (3) must be permitted to alternate between sitting and standing every 30 minutes while remaining at the work station; (4) no climbing of ladders, ropes, or scaffolds; (5) occasionally balancing, stooping[,] kneeling, crouching, crawling, and climbing ramps and/or stairs; (6) occasional reaching overhead bilaterally; (7) frequent handling and fingering bilaterally; (8) avoid concentrated exposure to extreme heat, extreme cold, wetness and humidity; (9) able to perform simple, routine, repetitive tasks but not at a production rate pace; (10) can have occasional interaction with supervisors and co-workers, but no interaction with the general public; (11) no tandem tasks or team work; (12) can tolerate occasional changes to a routine work setting defined as 1-2 per week.

(Tr. 945). Considering this RFC, the ALJ determined based upon testimony from the vocational expert that Plaintiff retained the ability to perform approximately 4 million jobs in the national economy, including such representative jobs as office helper, warehouse checker, and marker. Therefore, Plaintiff was not disabled. (Tr. 956).

The Appeals Council declined further review, leaving the ALJ's decision as the final

decision of the Commissioner.  Thereafter, Plaintiff filed this second judicial appeal of the Commissioner's decision.  In her Statement of Errors, Plaintiff argues that the second ALJ repeated the same errors on which this Court previously remanded, specifically: (1) failing to include a requirement for "supportive supervision; (2) improperly weighing the medical opinion evidence; (3) improperly evaluating Plaintiff's subjective complaints; and (4) conveying an improper hypothetical question to the vocational expert.

Not every Sentence Four remand will result in an award of benefits.  This time, the undersigned finds no reversible error.

## II.    Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability."  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial

4

evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35

F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or for disability

benefits, the Social Security Agency is guided by the following sequential benefits

analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial

gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's

impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's

impairments, singly or in combination, meet or equal a Listing in the Listing of

Impairments; at Step 4, the Commissioner determines whether or not the claimant can

still perform his or her past relevant work; and finally, at Step 5, if it is established that

claimant can no longer perform his or her past relevant work, the burden of proof shifts to

the agency to determine whether a significant number of other jobs which the claimant

can perform exist in the national economy.  *See Combs v.  Commissioner of Soc. Sec.*,

459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is

entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must

present sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that

left him unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

**B.   Plaintiff's Claims**

**1.  ALJ Adkins Explained the Basis for Rejecting "Supportive Supervision"**

One of the main errors made by the ALJ Motta concerned an opinion that Plaintiff's work environment should include "supportive supervision without any social interaction," which was endorsed by both a treating psychiatrist (Dr. Onady) and by a non-treating consultant (Dr. Hoyle).  The prior R&R found fault with the ALJ's failure to include that limitation because the ALJ offered only a "cursory rationale" and did not "explain how 'moderate' limitations in social functioning are incompatible with that restriction." (Tr. 1075-1076).  Like ALJ Motta, ALJ Adkins chose not to include a limitation in Plaintiff's RFC to require "supportive supervision without any social interaction."  Instead, ALJ Adkins included limitations for no contact with the public and only occasional contact with co-workers and supervisors.  Unlike ALJ Motta, however, ALJ Adkins further restricted Plaintiff's social interactions in the workplace, prohibiting "tandem tasks or team work" and allowing only 1-2 changes per week to a routine work setting.  (Tr. 945).

Plaintiff argues that ALJ Adkins' analysis remains deficient because he still did not include a specific mental limitation for "supportive supervision," which Plaintiff now equates to a job coach.   There are two problems with Plaintiff's argument:  (1) neither this Court nor any other authority defines "supportive supervision without any social interaction" as requiring a job coach for unskilled positions; and (2) this Court remanded only for a more complete <u>explanation</u> of how the mental RFC was determined, and did not mandate the inclusion of the precise phrase "supportive supervision in a setting free from the requirements of social interaction."

Concerning the relevant definition, Plaintiff focuses on the first part of the phrase, "supportive supervision," insisting it requires a "job coach or sheltered work!"  (Doc. 7 at

6

5). Although Plaintiff cites to vocational expert testimony as support for this ad hoc "definition," the VE did not provide a formal definition or cite to any regulatory authority. Instead, in response to a query from counsel about whether certain unskilled jobs would include "supporting [sic] supervision?," the vocational expert seemed to make assumptions, based on the context of counsel's queries, about what counsel was asking:

> A: Initially, you can have a job coach if you -- which is then an accommodation the employer has to agree to. And the job coach is provided by an outside source, not the employer. However, if you need something beyond that, supportive would say to me, some type of sheltered employment.

(Tr. 1012). Aside from that very brief colloquy, Plaintiff cites no regulatory authority or social security case law that defines the phrase "supportive supervision" under the regulatory framework of the Social Security Act. Contrary to Plaintiff's argument, a single VE's contextual assumption is insufficient to support her premise that "supportive supervision" is strictly defined under the Social Security Act as "a job coach or sheltered work." As the Commissioner points out, the consulting psychologist, Tonnie Hoyle, Psy.D., did not define the phrase she used, and it is not defined by any controlling law.

Contrary to Plaintiff's newly proposed definition, Dr. Hoyle concluded that "the claimant was not significantly limited in her ability to get along with coworkers or supervisors." (Tr. 949). Dr. Hoyle also concluded that Plaintiff's "ability to sustain an ordinary routine *without special supervision*" was "Not significantly limited." (Tr. 101, emphasis added). These findings significantly undermine and frankly contradict Plaintiff's hypothesis that Dr. Hoyle intended to limit her to a "sheltered work environment."

Even if the phrase were so defined, however, the essence of the prior remand was the ALJ's "cursory rationale" in addressing the rejection of an additional mental limitation relating to the *full* phrase "supportive supervision *in a setting free from the requirements*

7

*of social interaction.*" (Tr.1076, emphasis added). Unlike ALJ Motta, ALJ Adkins went to

great length to explain why he believed that the mental limitations provided in the RFC

were sufficient.

> A State Agency consultant indicated that [the] claimant could work with supportive supervision in a setting free from the requirements of social interaction…. The Court took issue with the explanation that a moderate limitation in social functioning was not compatible with such a restriction, but provided no basis as to its reasoning, or how moderate limitations in responding to work stress and changes in work setting required supportive supervision. All jobs require some supervision, but the term supportive supervision is not defined for social security or vocational purposes. The Court did not set forth …any definition of supportive supervision in its opinion. The record demonstrates that the claimant is capable of tolerating occasional contact with supervisors, which would necessarily entail supervision in support of doing her job. That broad statement is not a significant limitation when viewed in the context of occasional contact from supervisors in the performance of simple, routine, and repetitive tasks. That consultant [Hoyle] also noted that the claimant was not significantly limited in her ability to get along with coworkers or supervisors, which is consistent with the documentation of her interaction with others in the record. A restriction against teamwork and tandem tasks essentially eliminates social interaction while working. Further, even Dr. Onady indicated that the claimant was, from an overall standpoint, no more than moderately limited in her ability to maintain social function and maintain concentration, persistence, or pace. Therefore, based on the overall record, the claimant retains the ability to perform simple, routine, and repetitive tasks without production rate pace, reduced personal contact in the workplace, and occasional changes as defined. The record supports no additional restrictions from a mental standpoint.

(Tr. 949, emphasis added).

ALJ Adkins adopted the mental RFC opinions of Dr. Hoyle except for the phrase

requiring "supportive supervision in a setting free from requirements of social interaction."

In addition to explaining why his RFC limitations encompassed the portions of that phrase

that the ALJ accepted as supported by the evidence, ALJ Adkins described the phrase

as

> vague, nominally supported, and …adequately accounted for by limiting the claimant's interaction as described. There are no cognitive or intellectual deficits that would require supportive supervision. There is no evidence of

> serious psychological disorder that would preclude most interaction with others. Accordingly, the limitation to occasional contacts with coworkers and supervisors with no teamwork or tandem tasks, and no public contact account for the limitations in this area supported by the record.

(Tr. 952). Reviewing this record a second time, the undersigned finds no fault with the ALJ's very thorough analysis and explanation of the mental RFC after remand. In short, the mental RFC is well-supported by substantial evidence in the record as a whole.

### 2. No Error in Assessment of Opinion Evidence

In her second assertion of error, Plaintiff argues that the ALJ erred by giving Dr. Hoyle "significant weight" while rejecting the work-preclusive opinions of her treating psychiatrist, Dr. Onady. In the prior decision, the undersigned pointed out that "there is support in the record for some of the ALJ's stated reasons for rejecting Dr. Onady's opinions," but noted that other portions of the analysis were "problematic." (Tr. 1077). However, the undersigned expressed concern with a comment in which ALJ Motta had discounted Dr. Onady's opinions for "relying heavily on the claimant's subjective complaints of panic attacks and other emotional distress" even though "no source has witnessed a so-called panic attack…." (*Id.*) The undersigned pointed out that rejecting a psychiatric opinion "*solely*" on the basis of "subjective complaints" is disfavored, since mental impairments are "not as readily amenable to substantiation by objective laboratory testing as a medical impairment." (*Id.*, internal quotation marks and citation omitted). Despite these concerns, the undersigned found that many reasons for rejecting Dr. Onady's extreme and work-preclusive opinions were well supported. (*See generally*, Tr. 1077-1079).

In this second appeal, Plaintiff argues that the second ALJ committed reversible error by failing to give Dr. Onady's mental RFC opinions controlling weight, and instead giving greater weight to the opinions of the consulting psychologist, Dr. Hoyle. This time,

I find no error.

A long-standing regulation concerning the opinions of treating physicians, 20 C.F.R. §404.1527(c)(2), provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." For claims filed before March 27, 2017 like this one, the treating physician rule[1] requires "the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009).

Despite the presumptive weight given to the opinions of the treating physician, if the opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996). When an ALJ does not give controlling weight to the opinion of a treating physician, the Commissioner is required to provide "good reasons" for that decision. *Id.* The ALJ must explain the amount of weight given to the opinion after considering the following relevant factors:  the length, nature, and extent of treatment relationship, evidence in support of the opinion; consistency with the record as a whole; and the physician's specialization.  20 C.F.R. § 416.927(c).  However, while an ALJ is required to provide "good reasons," the ALJ is not required to provide "an exhaustive

---

[1]Effective March 27, 2017, many regulations have been significantly revised or rescinded.  However, the elimination of the treating physician rule applies only to "claims filed on or after March 27, 2017." *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. at 5845. Thus the "treating physician rule" and related SSRs and case law continue to apply to Plaintiff's claim. *Accord, Glanz v. Com'r of Soc. Sec.*, 2018 WL 3722318 at n. 5 (N.D. Ohio July 17, 2018).

factor-by-factor analysis." *Francis v. Com'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Even prior to remand this Court acknowledged that many of the records supported the rejection of Dr. Onady's work-preclusive opinions.   Following remand, the ALJ elaborated upon the basis for concluding that Dr. Onady's opinions were not entitled to controlling weight because they were neither well-supported nor consistent with the record as a whole, including most of Dr. Onady's own records.

> [H]er visits appear brief and note that medications control the claimant's symptoms in general with no changes noted in signs, symptoms, or impairment.  Dr. Onady's visits reflect no significant mental health concerns, nor do they note medication side effects.  Further, Dr. Onady's more recent notes demonstrate no change in the nature of severity of her symptoms, despite the claimant reporting that she got out more and was more physically active.  Those records note the claimant's subjective complaints, but again, they reflect stability in her presentations.  In addition, with the exception of minor medication adjustments, the nature and frequency of the claimant's treatment has not changed at any time.  There is no evidence that the claimant has undergone any extensive intensive counseling, group therapy, or other treatment modalities.  The claimant has been found to experience moderate limitations in her social functional and ability to maintain concentration, persistence, or pace.  Dr. Onady also appears to rely heavily on the claimant's subjective complaints of panic attacks and other emotional distress.  However, it is noted that no source has witnesses a so-called panic attack, nor have they witnessed symptoms indicative of marked functional impairment.   The Court indicated that the record contained no proof that those panic attacks did not happen, and emphasized that psychiatric symptoms are generally subjective.  However, that assertion does not change the fact that no source has reported observations consistent with marked anxiety or distress, nor has she sought urgent care for a so-called panic attack.
>
> The restrictions above take into account Dr. Onady's overall moderate assessments, but her designation that claimant's reported anxiety was such that there was complete inability to function independently outside the home is not supported by [the] record and is not consistent with the claimant going to an amusement park and on a trip to Tennessee without mental issues. In addition, as noted above, the claimant reported that she loved to be outdoors, go to the park, and walk and she testified…earlier that she drove once or twice a week.  In addition, although the claimant reported she was markedly restricted physically and rarely left her home, she reported to her therapist that she was canoeing and hiking, which appears to contradict a

marked fear of leaving the house. Dr. Onady also indicated that the claimant experienced one or two episodes of extended decompensation, but the record documents no such episodes. … It appears that, despite generally stable and unremarkable mental status examinations, Dr. Onady based her several assessments primarily on the claimant's subjective complaints of panic attacks and marked functional difficulty related top [sic] anxiety and depression, and not on her own clinical observations.

(Tr. 954).

Plaintiff complains about ALJ Adkins' comment that Dr. Onady's relied on Plaintiff's "subjective" reports. However, this Court previously remanded due to a constellation of errors in total, not (as Plaintiff seems to believe) based solely on the Court's concern with a small portion of ambiguous language used by ALJ Motta. As the Court previously noted, only some of ALJ Motta's reasoning was "problematic." The Court explained that rejecting a psychiatric opinion "*solely*" on the basis of "subjective complaints" is disfavored. Following remand, ALJ Adkins took pains to clarify that he was not rejecting Dr. Onady's opinions "solely" because she relied upon Plaintiff's subjective complaints, but for many well-supported reasons. The record as a whole provides substantial (if not overwhelming) evidence that Plaintiff was not as limited as Dr. Onady believed she was. Therefore, ALJ Adkins' analysis satisfies the "good reasons" standard.

The undersigned also finds no error in the ALJ's decision to give Dr. Hoyle's RFC opinions "significant" weight. Despite a regulatory structure that generally requires ALJs to give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians," *see Blakley v. Com'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009), "[i]n appropriate circumstances," the opinions of non-examining consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.,* 581 F.3d at 409 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).

Although Plaintiff did engage in a significant amount of mental health treatment following Dr. Hoyle's examination, the ALJ acknowledged and discussed those treatment records.

### 3.  No Error in the Evaluation of Plaintiff's Subjective Complaints

In her third claim, Plaintiff asserts that ALJ Adkins erred in the evaluation of her credibility.  Plaintiff testified to debilitating limitations, such as being unable to sit or walk for more than 20 minutes or stand long enough to complete laundry.  In the last R&R, the undersigned criticized ALJ Motta's evaluation of some of Plaintiff's subjective complaints, including her alleged fatigue, panic attacks, and social limitations, despite concluding that the ALJ's credibility assessment overall was at least "partially supported by the record." (Tr. 1081).  As with other errors, perceived inaccuracies in the prior credibility assessment added to the Court's conclusion that the errors, considered in their totality, required remand.  Still, the undersigned was careful to point out that "[i]f credibility errors…were the sole errors in this record, the undersigned might be inclined to view them as harmless…."  (Tr. 1082).

With respect to Plaintiff's allegedly debilitating fatigue, the undersigned cited to an apparent "factual error."  ALJ Motta suggested that she saw <u>no</u> evidence of fatigue in the record, but records from Dr. Alappatt "consistently confirm[ed] fatigue" as did a note from Dr. Onady that referred to Plaintiff feeling "overwhelmed with pain and fatigue."  (Tr. 1082).  Because other substantial evidence supported ALJ Motta's rejection of Dr. Alappatt's RFC opinions, the undersigned reasoned that "[i]f this were Plaintiff's only claim of error [evidence of fatigue], the undersigned would have no difficulty finding [the] error to have been harmless…. However, because errors concerning the evaluation of Plaintiff's mental impairments and credibility may have impacted the ALJ's analysis of

Plaintiff's physical pain complaints and fatigue, the ALJ should reconsider the evaluation of Plaintiff's physical RFC limitations on remand."  (Tr. 1072).

The undersigned also noted a disconnect between ALJ Motta's finding that Plaintiff's agoraphobia was a severe impairment, and her suggestion that Plaintiff's "so-called panic attacks" were without "verification."  (Tr. 1082).  The prior R&R clarified that Plaintiff's alleged panic attacks and other subjectively reported symptoms were not necessarily disabling, but that additional review was required:

> Notwithstanding the recommended remand of this case, many of Plaintiff's records support the non-disability determination. For example, beginning with her initial diagnostic assessment interview on September 14, 2011 prior to treatment, Plaintiff reported that her fear of panic only "sometimes…prevents her from going out in public." In that same assessment, she reported strong familial relationships, two close friendships, and that she "enjoys walks and going to the park," and "likes being outdoors." (Tr. 584). She wanted a job, but had been unable to find one. (Tr. 585). Her GAF score was assessed at 55, reflecting no more than moderate symptoms. (Tr. 17).

 (Tr. 1079).   Thus, the prior R&R reflects that the errors in ALJ Motta's credibility assessment were fairly minor, and required reconsideration on remand only because of other errors that tipped the balance towards reversal.

In this second judicial appeal, Plaintiff argues that ALJ Adkins committed the same errors.  The undersigned does not agree; ALJ Adkins thoroughly explained his adverse credibility finding.  For example, unlike ALJ Motta, ALJ Adkins explicitly acknowledged and considered records in which Plaintiff reported fatigue, but discussed multiple inconsistencies concerning the level of her reported fatigue. (Tr. 953).  In contrast to her testimony that she could not sit or walk for more than 20 minutes or stand long enough to complete laundry, records reflect that she took walks outside, went canoeing and hiking, went on out-of-state trips and dressed up and went out for Halloween.  (Tr. 951, 1315, 1380; *see also* Tr. 351, 410, 760).   There also was no evidence that medication or

14

treatment caused fatigue or other side effects that adversely affected her ability to perform work-related activities. (Tr. 950). In other records, Plaintiff denied medication side effects (including fatigue) to her primary care physician. She reported no medication issues to Dr. Onady after restarting treatment in 2017 and denied medication issues to her therapist. (*Id.*) After discussing these inconsistencies, the ALJ reasonably rejected additional fatigue-related limitations including an opinion that she would miss four days of work per month. (*Id.*) The cited records constitute substantial evidence to support that determination.

Likewise, the undersigned finds no error in the assessment of Plaintiff's panic attacks. Even the prior R&R acknowledged records in which Plaintiff reported significant improvement, with "very minimal" anxiety and no recent panic attacks. By the time of a second mental RFC assessment, her diagnosis had changed to anxiety alone and her GAF score had improved to 70, reflecting an improvement from moderate to mild symptoms. (Tr. 1079). Although ALJ Adkins used some similar language to ALJ Motta, repeating that there was "no verification of" Plaintiff's reports of frequent panic attacks and isolation, and that no source reported having witnessed any such events, ALJ Adkins clarified that he was not rejecting the diagnosis of agoraphobia. Instead, he reasonably concluded that Plaintiff's panic attacks were not disabling based in part upon the lack of "urgent treatment for, or observations of panic attacks beyond the claimant's subjective reports." (Tr. 948). In addition to the absence of such evidence, other record evidence contradicted Plaintiff's account that extreme psychological symptoms left her unable to leave her home.

> While [the absence of urgent treatment or clinical observations]… may not
> discount the diagnosis of agoraphobia, it does not change the lack of
> observations of significant anxiety or panic in the precise situation when she
> alleges panic, ie being away from her house, or at other times. She testified

15

> at the most recent hearing that even the thought of leaving her house causes anxiety. However, she reported visiting her mother and engaging in outdoor activities with her boyfriend, including canoeing, hiking, and seasonal activities such as dressing up and going out for Halloween….

(Tr. 948; *see also* Tr. 954, rejecting claim of a marked fear of leaving the house).

A third error that Plaintiff argues that ALJ Adkins repeated concerns Plaintiff's social limitations. The undersigned previously found fault with ALJ Motta's citation to Plaintiff's social abilities in her *pre-disability* work as a waitress, as well as the reliance on pre-existing relationships that predated her alleged disability. "The fact that Plaintiff was once able to work as a waitress…should not have been used as evidence that she has not developed such symptoms [social limitations] over time." (Tr. 1076). Plaintiff complains that ALJ Adkins also cited to Plaintiff's contacts with her boyfriend, mother and daughter. However, significant differences exist between ALJ Adkins' full analysis and the prior opinion of ALJ Motta. Unlike ALJ Motta, ALJ Adkins did not rely on Plaintiff's pre-disability work as a waitress back in 2008 to discount more recent social limitations. Instead, ALJ Motta fleshed out the record supporting Plaintiff's abilities to socialize *after* her alleged onset of disability, not only by continuing activities with her boyfriend, mother and daughter, but with two close friends, and by engaging in additional activities such as babysitting her great niece and nephew. She also had no difficulty interacting with treating or examining sources. (Tr. 943, 949).

ALJ Adkins cited to relevant medical opinions to further support his findings. Dr. Hoyle opined she was not significantly limited in her ability to get along with coworkers or supervisors, and even Dr. Onady opined that the claimant was no more than moderately limited in her ability to maintain social function. Giving Plaintiff the benefit of the doubt, ALJ Adkins added restrictions to further limit social interactions in the workplace, by precluding tandem work or teamwork.

16

Plaintiff argues strenuously that ALJ Adkins' focus on her activities was erroneous, because "walking in nature and canoeing can be done alone or with the boyfriend and …do not hurt [her] subjective complaints" based upon her testimony that on other days, she is incapable of such activities.  (Doc. 7 at 12).   However, based on the record presented, the undersigned has no difficulty in finding substantial evidence to support the ALJ Adkins' conclusions.  *See Blevins v. Com'r of Soc. Sec.*, Case No. 1:15-cv-717, 2017 WL 769873 at *8 (S.D. Ohio Feb. 8, 2017) ("[T]he ALJ in no way improperly insinuated that Plaintiff's activities of daily living were equivalent to the demands of full-time work.  Yet, the ALJ reasonably considered the fact that Plaintiff's activities were inconsistent with his allegations of total disability.").

In addition to the inconsistencies concerning Plaintiff's fatigue level, panic attacks, and social limitations, the ALJ cited to multiple other records that supported his determination that Plaintiff's symptoms were not disabling.  Plaintiff told Dr. Bedel that she only took Motrin for her "occasional" joint pain due to rheumatoid arthritis.  (Tr. 950).  The ALJ appropriately considered Plaintiff's conservative treatment regimen, and her inconsistent reports about the reasons she stopped working.  (Tr. 951).  She alleged marked psychiatric symptoms that began when she was fired from her last job in 2008, but sought no treatment of any kind (physical or mental) until 2011.[2]  (*Id.*) She alleged she could not work, but reported to her therapist that she wanted to work but could not find a job.  (Tr. 951).  She asserted difficulty using her hands to open bottles or use buttons and zippers, but her treating physician's clinical records documented few objective

---

[2]Plaintiff argues that ALJ Adkins erred by criticizing her lack of psychological treatment prior to 2011.  To the extent that Plaintiff suggests that the undersigned previously found this to be error, she is mistaken.  The prior R&R stated that Plaintiff "submitted no evidence that she sought any treatment for her psychological symptoms prior to September 2011," and found ALJ Motta's determination that the onset of alleged disability did not occur until April 27, 2011 to be substantially supported.  (Tr. 1083).

findings. (Tr. 946). She alleged she needed to elevate her legs due to swelling but Dr. Alappatt's exams did not reveal significant swelling or a need to elevate her legs. (Tr. 947, 950). Dr. Alappatt's records also documented far less severe complaints of pain than Plaintiff alleged at the hearing.

In one final attack on ALJ Adkins' analysis of her subjective complaints, Plaintiff attacks ALJ Adkins' reference to a lack of any objective findings to support her diagnosis of fibromyalgia. (Tr. 946). However, "a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Com'r of Soc. Sec.*, 260 Fed. Appx. 801, 806 (6th Cir. 2008) (additional citations omitted). ALJ Adkins appropriately pointed out that there was little evidence of fibromyalgia outside of Plaintiff's reports that she had such a diagnosis with "no significant clinical abnormalities beyond subjective complaints," (Tr. 939). Although Dr. Alappatt made the diagnosis, his examinations revealed few findings and consistently reported that he did not observe swelling, in contrast to Plaintiff's testimony that she needed to elevate her legs due to swelling. In addition to the reference to the "rather mild objective and clinical findings," (Tr. 946), ALJ Adkins considered Plaintiff's treatment regimen as well as the level of her subjective complaints and daily activities. (Tr. 951). Plaintiff received only conservative care and Dr. Alappatt's own records documented significantly less severe complaints of pain that Plaintiff alleged at the hearing. (*Id.*) Plaintiff's last visit to Dr. Alappatt was January of 2015. (Tr. 947).

Importantly, the ALJ did not completely disregard Plaintiff's subjective complaints but instead found her claim of disabling pain to be inconsistent with the record as a whole. Still, recognizing that "the nature of rheumatoid arthritis and fibromyalgia" cannot be determined by objective criteria alone, ALJ Adkins found it "appropriate to restrict the claimant to performing the postural activities of work to no more than occasional as more

18

frequent activity may aggravate …complaints of joint pain." (Tr. 947).  Similarly, despite clinical records that appeared to contradict Plaintiff's reported difficulty with the use of her hands and reaching, the ALJ allowed "some benefit of doubt" and restricted Plaintiff to "no more than occasional overhead reaching" with a preclusion of "repetitive or constant handling and fingering" to no more than frequent.  (Tr. 947)

This Court has previously affirmed similar cases in which a plaintiff failed to "cite to any medical source opinion identifying any functional restrictions stemming from her fibromyalgia or any additional evidence supporting her statements regarding the debilitating effects of her fibromyalgia." *Thomas v. Com'r of Soc. Sec.*, Case No. 2:18-cv-108, 2019 WL 642679 at *16 (S.D. Ohio Feb. 15, 2019).  As the ALJ noted, Plaintiff consistently reported that she experienced only "occasional" joint pain and did not mention fibromyalgia.  (Tr. 951).  In short, "many records reflect an activity level inconsistent with significant work limitations from fibromyalgia." *Dragon v. Astrue*, Case No. 1:11-cv-44, 2011 WL 7430207 at *7 (S.D. Ohio Dec. 15, 2011). On the whole, ALJ Adkins very thoroughly explained his evaluation of Plaintiff's many subjective complaints.[3]

### 4.  The Hypothetical to the Vocational Expert Did Not Reflect Error

In her final claim, Plaintiff argues that the ALJ erred in finding that Plaintiff could maintain "occasional" contact with supervisors and co-workers.  She argues that the failure to require "sheltered work," or work-preclusive limitations that she would have missed more than four days per month[4]  and needed extra breaks, and without no contact

---

[3]Any minor imperfections in the ALJ's symptom evaluation does not mean that a second reversal is required.  The substantial evidence standard supports affirming an ALJ's decision when substantial evidence exists in the record as a whole, as it does here.

[4]The limitation of missing four days per month comes from check-box forms.  However, the undersigned previously found that the ALJ appropriately rejected the opinions of Dr. Alappatt *(see* Tr. 1067, 1071), and as discussed above, further concludes that Dr. Onady's opinions were properly rejected as not well-supported and as inconsistent with other substantial evidence.

at all with supervisors or co-workers, all constitute reversible error. (Doc. 7 at 13). However, an ALJ is required to incorporate in a hypothetical "only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (additional citation omitted). For the reasons discussed, the undersigned finds no error in the hypothetical RFC limitations posed by the ALJ to the vocational expert in this case.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** the Commissioner's non-disability decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED**.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SACHA B. DAUGHERTY,                                    Case No: 1:19-cv-600

     Plaintiff,

                                                                  Black, J.

     v.                                                 Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.


**NOTICE**

       Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).